**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOYCE A GAETANO | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| vs. | ) | **Civil Action No. 04-1812** |
| | ) | |
| BAYER, INC. | ) | |
| | ) | **Judge Nora Barry Fischer** |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

This is an action in employment discrimination. Plaintiff Joyce Gaetano claims that Defendant Bayer, Inc., for whom she worked from 1979 until 2002, discriminated against her based upon her sex and retaliated against her in violation of Title VII, 42 U.S.C. §2000e-1 *et. seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et. seq.* (PHRA). Additionally, Plaintiff alleges a breach of contract claim against Defendant, stemming from Defendant's alleged failure to comply with a settlement agreement these parties reached in a prior sex discrimination lawsuit brought by Plaintiff, <u>Gaetano v. Bayer</u>, at Civil Action No. 98-917 (Gaetano I), and a claim for fraudulent concealment which stems from the Gaetano I settlement negotiations. Plaintiff seeks compensatory damages, punitive damages, consequential damages and attorneys' fees.

Pending before this Court is Defendant's omnibus motion for summary judgment. [DE 54]. After careful consideration and for the reasons that follow, Defendant's motion is granted in part and denied in part.

## II.     JURISDICTION AND VENUE

Jurisdiction in this Court is based upon Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*.  Jurisdiction over the Plaintiff's PHRA claims, breach of contract claim and fraudulent concealment claim is provided by the supplemental jurisdiction statute, 42 U.S.C. § 1367.  Venue is appropriate in this Court because the events giving rise to Plaintiff's claims all occurred within this judicial district. 28 U.S.C. § 1391(b).

## III.     FACTUAL BACKGROUND

The Court has gleaned the following factual background from the parties' summary judgment filings.

Plaintiff, a chemical engineer, began working for Defendant in 1979. [DE 39 at ¶¶ 6, 7; 65 at ¶ 2].  In May of 1998, Plaintiff filed Gaetano I wherein Plaintiff claimed that she had been discriminated against based upon her sex alleging, *inter alia*, that she was not promoted at the same pace as similarly situated males. [DE 65 at 6].  During the course of the litigation, on July 1, 2000, Defendant promoted Plaintiff to the position of Business Manager, Froth CPS Foams ("Froth Foams position") an E-1 level management position. [DE 65 at 18].  The parties settled Gaetano I on March 9, 2001. [DE 63-19].  The terms of the Gaetano I settlement agreement obligated Defendant to promote Plaintiff to a first level management position (E-1), which Defendant had already done on July 1, 2000, and prohibited Defendant from retaliation against Plaintiff for bringing the Gaetano I lawsuit.  [DE 63-19].  As part of the settlement agreement, Defendant also agreed to remove disparaging materials from Plaintiff's personnel file:

> Bayer has agreed to remove from Gaetano's personnel file and to destroy 4 letters dated December 11, 1995, February 8, 1996, February 13, 1996 and February 13, 1996, an undated and unsigned

note given to Mr. Harrick from Mr. Kirk and a handwritten note prepared by Mr. Harrick dated June 20, 1995 ("Subject J. Gaetano Let's Talk") both of which contain unfavorable remarks about Gaetano, and any rebuttal prepared by Gaetano to any of the specified documents. [DE 63-19 at ¶ 5].

In her Froth Foams position, Plaintiff reported to Robert Daniele, Vice President of the Specialty Business Group. [DE 65 at ¶ 20]. In January of 2001, as part of a corporate wide effort to reduce the workforce, Mr. Daniele worked with Defendant's HR Director, Ann Hoover, to create a combined position in his group entitled Director, Specialty Foams, which would be the result of a consolidation of three positions, including Plaintiff's Froth Foams position. [DE 63-12; 65 at ¶ 24]. In fact, on January 23, 2001, Mr. Daniele sent an email to Ann Hoover describing the revised qualifications necessary for the new, combined position. [DE 63-12]. In April of 2001, approximately one month after the parties finalized the Gaetano I settlement agreement, Mr. Daniele effectuated the consolidation and creation of the new position. [DE 62 at 4; 63-6 at 22 of 43; 65 at ¶24]. The two other positions which were consolidated were Manager of Microcellular Foam, held by Jyothi Pisipati, and Manager of Flexible Molded/Specialty Foam held by Jim Jasenek. [DE 65 at ¶25]. The combined position was awarded to Jim Thompson and the positions previously held by Plaintiff, Mr. Jasenek and Ms. Pisipati were all eliminated. [DE 65 at ¶¶ 29, 43].

At the time Plaintiff was informed of the elimination of her position and that the Director, Specialty Foams position would be awarded to James Thompson, Mr. Daniele and Ms. Hoover spoke to Plaintiff about Bayer's voluntary separation package and advised Plaintiff that there was no place for her at Bayer. [DE 63-6 at 22 of 43]. Plaintiff rejected the voluntary separation package. [DE 63-6 at 25 of 43]. During this time, Defendant laid off a number of employees in Plaintiff's former group, the Polyurethane Group, in connection with its reduction in force. [DE 65 at ¶¶ 21, 23].

On February 26, 2002, Plaintiff filed a charge of discrimination for the elimination of her Froth Foams position and Defendant's decision to award the newly created position of Director, Specialty Foams to James Thompson. [DE 63-3]. Plaintiff did not address Defendant's failure to hire her for any other positions in this charge. [DE 63-3].

In September 2001, about five months after her Froth Foams position was eliminated, Plaintiff was placed in a position called Industry Manager Raw Materials and Spray Elastomers ("Raw Materials position"), an E-1 management position in the Elastomers group with the same salary as her Froth Foams position but with no direct reports or sales or technical staff. [DE 65 at ¶¶ 47, 48]. Additionally, in her Raw Materials position, Plaintiff no longer reported directly to VP Peter Vanacker and was removed from the VP's leadership team, a career-building opportunity. [DE 62 at 6, 21-22; 63-9 at 21 of 30]. Sometime after her reassignment to the Raw Materials position, Plaintiff informed her new supervisor, Patricia Boyd, that she needed to more narrowly focus the scope of her responsibilities due to the volume of business for which she was responsible for and her lack of any direct reports or support staff. [DE 65 at ¶49]. In the spring 2002, sixty to eighty million pounds of Plaintiff's product responsibility was then assigned to two other newly appointed business managers in the Elastomers group, Jeff Lear, Business Manager Spray Elastomers/Reinforcement, and Sergio Franyutti, Business Manager Cast Elastomers, both of whom had direct reports, including sales and technical staff. [DE 65 at ¶¶ 53, 56]. These two positions, Business Manager Spray Elastomers/Reinforcement and Business Manager Cast Elastomers, were created in the spring of 2002 in connection with Defendant's reorganization. [DE 65 at ¶63]. Plaintiff, who was not considered for either of these new positions, retained approximately fifty-five million pounds of product, the majority of which was raw materials product. [DE 62 at 7; 65 at ¶¶ 58, 70, 72, 77].

During the time that Plaintiff held her Raw Materials position, two additional industry manager positions were created and filled as part of the reorganization: Industry Manager Special Products and Industry Manager Canal Liners. [DE 65 at ¶86]. These positions were awarded to Sean Gaus and Rolland Bradley, respectively. Plaintiff was not considered for either of these positions. [DE 65 at ¶¶ 87, 89, 90, 91, 94].

In July of 2002, Defendant's parent company announced a restructuring which included the creation of the new Bayer Polymers organization. [DE 65 at ¶99]. In the fall of 2002, Peter Vanacker, then Vice President of the Specialties Business Group, implemented the restructuring. [DE 65 at ¶100]. As part of the restructuring, Peter Vanacker eliminated the raw materials function. [DE 65 at ¶102]. Consequently, Plaintiff's Raw Materials position was eliminated in November 2002 and she was left without a job. [DE 65 at ¶¶ 104, 106]. The positions held by Jeff Lear, Sergio Franyutti, Sean Gaus and Rolland Bradley all survived restructuring. [DE 63-17].

Plaintiff was then considered for, but, denied, six other positions by Peter Vanacker in or around November of 2002. [DE 65 at 108]. Defendant terminated Plaintiff in December of 2002. [DE 65 at 146]. Plaintiff filed a charge of discrimination with the EEOC on May 22, 2003 alleging that her termination and Defendant's failure to hire her for another position were discriminatory and retaliatory. [DE 56 at 15; 63-12].

Plaintiff filed the instant lawsuit on November 24, 2004. [DE 1]. On June 6, 2006, Plaintiff amended her complaint adding the claim of fraudulent concealment, based upon Defendant's alleged concealment of its plan to consolidate Plaintiff's Froth Foams position during the parties' Gaetano I settlement negotiations in March of 2001. [DE 24].

In this case, Plaintiff alleges that Defendant discriminated against her based on her sex and

retaliated against her in violation of Title VII and the PHRA, breached the Gaetano I settlement agreement by retaliating against her and failing to remove the disparaging materials from her personnel file, and fraudulently concealed its plan to consolidate Plaintiff's Froth Foams position during Gaetano I settlement negotiations. [DE 39].

On October 6, 2006, Defendant moved for summary judgment as to all of Plaintiff's claims. [DE 54, 55, 56]. As of January 5, 2007, the issues were fully briefed. Then, on April 6, 2007, the case was reassigned from Judge Hardiman to Judge Fischer. A status conference was held before Judge Fischer on May 11, 2007, wherein the parties were given an opportunity to file supplemental briefs to update the Court on any changes in the law since the conclusion of the parties' briefing. Plaintiff filed a supplemental brief on May 23, 2007 and Defendant filed its supplemental brief on June 5, 2007. [DE 77, 78]. This Court now addresses Defendant's motion for summary judgment.

## IV.   STANDARD OF REVIEW

Summary judgment under Fed. R. Civ. P. 56(c) is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted). In deciding a summary judgment motion, the court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' – that is, pointing out to the District Court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Celotex*, 477 U.S. at 325). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson,* 477 U.S. at 255 (1986)." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *see also Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all doubts, in favor of the non-

moving party).

## V.    DISCUSSION

Plaintiff alleges  four causes of action which Defendant seeks to dismiss as a matter of law. First, Plaintiff claims Defendant discriminated against her based on her sex in violation of Title VII and the PHRA when it eliminated her Raw Materials position and terminated her employment. Second, Plaintiff claims Defendant committed multiple retaliatory acts against her in violation of Title VII and the PHRA: Defendant's consolidation of her Froth Foams position and failure to award her the new, Director, Specialty Foams position; Defendant's transfer of Plaintiff to the Raw Materials position; Defendant's elimination of her Raw Materials position and ultimate termination; and Defendant's failure to hire Plaintiff for other positions which survived restructuring.  Third, Plaintiff claims Defendant breached the Gaetano I settlement agreement by retaliating against her in violation of the terms of the agreement and failing to remove the disparaging materials from her personnel file.  Fourth, Plaintiff alleges Defendant fraudulently concealed its plan to consolidate Plaintiff's Froth Foams position during Gaetano I settlement negotiations.  [DE 39].  The Court will address each of Plaintiff's claims, in turn.

### A.    Title VII Claims

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin, and its anti-retaliation provision forbids discrimination against an employee or job applicant who, *inter alia*, has made a charge, testified, assisted, or participated in a Title VII proceeding or investigation.  *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2406 (2006), *citing* 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 2000e-3(a).  Plaintiff claims she was subjected to discriminatory and retaliatory treatment by Defendant in violation of

Title VII and the PHRA.[1]  Defendant, however, contends that these claims fail as a matter of law.

## 1.    Sex Discrimination Claim

Plaintiff claims Defendant discriminated against her based upon her sex when Defendant eliminated her Raw Materials position and ultimately terminated her employment during Defendant's reduction in force ("RIF").  The parties agree that the three step analysis set forth in the *McDonnell Douglas* line of cases applies to Plaintiffs' sex discrimination claim.  *Simpson v. Kay Jewelers,* 142 F.3d 639, 644 n.5 (3d Cir. 1998), *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  First, the plaintiff must establish a prima facie case of discrimination.  *Simpson*, 142 F.3d at 644 n.5, *citing St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 506 (1993).  Second, "upon such a showing by the plaintiff, the burden shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for the adverse decision." *Simpson*, 142 F.3d at 644 n.5 (*citing Hicks*, 509 U.S. at 506-07).  Third, the plaintiff must then demonstrate that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination.  *Id.*  Defendant contends that Plaintiff's discrimination claim fails because she cannot establish a prima facie case.  Defendant further contends that even if Plaintiff could establish a prima facie case, her discrimination claim fails because she cannot show pretext.  For the reasons discussed below, this Court disagrees with Defendant on both counts.

### a.    Prima facie case

In order to set forth a prima facie case of discrimination under Title VII in the context of a RIF, the plaintiff must show: (1) she is a member of a protected class, (2) she was qualified for the

---

[1]As Title VII and the PHRA are interpreted under the same standards, Plaintiff's Title VII and PHRA claims will be discussed coextensively.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d cir. 1996).

position in question, (3) she was terminated, and (4) individuals not within the protected class were retained. *In re Carnegie Center Associates*, 129 F.3d 290, 294-95 (3d Cir. 1997), *citing Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *Lepore v. Lanvinson Systems, Inc.*, No. 03-3619, 2004 WL 2360994, * 2 (3d Cir. Oct. 19, 2004). With regard to the fourth element, "individuals not within the protected class" are those employee who are "similarly situated" to the plaintiff. *Lepore,* 2004 WL 2360994, at *3.

Defendant contends that Plaintiff cannot establish the fourth element of her prima facie case because her function was unique and she was not "similarly situated" to any individuals outside of her protected class. [DE 56 at 10]. The determination of whether other employees are "similarly situated" requires the court to undertake a fact-intensive inquiry on a case-by-case basis. *Monaco v. American General Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004) (applying the prima facie RIF analysis in an age discrimination case), *citing Pivrotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999). The court should look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. *Monaco*, 359 F.3d at 305.

While the court in *Lepore* explained "similarly situated" as "they work in the same area in approximately the same position," *Lepore,* 2004 WL 2360994, at *3, courts determining whether a plaintiff was "similarly situated" to employees retained in a RIF have applied the term more liberally. For instance, in *Torre v. Casio. Inc.,* 42 F.3d 825, 831 (3d Cir. 1994), the court held that the plaintiff, whose product marketing manager position was eliminated during a RIF, was similarly situated to retained regional sales managers despite the fact that the plaintiff's position was newly created, "unique," and not a part of the sales department. The "similarly situated" retained employees did not hold the same position as the plaintiff at the time of his termination or even work

in the same area. Rather, the retained employees held the same position as the plaintiff did *before* he was transferred to the position of product marketing manager. *Torre*, 42 F.3d at 831. In two cases where the Third Circuit held that the plaintiffs could not establish their prima facie cases because they were not similarly situated to retained employees, the plaintiffs' positions were of an entirely different management and seniority level than that of the retained employees. In *Monaco*, the court held that the plaintiff, former vice president of the eastern region of the United States for the defendant-company, was not similarly situated to the branch managers he had supervised. *Monaco,* 359 F.3d at 306. In *Anderson v. Consol. Rail Corp.,* 297 F.3d 242, 250 (3d Cir. 2002), the court held that certain plaintiffs, who had been employed by the defendant for over twenty years, were not similarly situated to retained entry-level or low level employees simply because they were qualified to perform those entry-level positions.[2]

Here, Defendant raises the following in support of its argument that Plaintiff was not similarly situated to any retained employees: Plaintiff was the only Industry Manager for Raw Materials in the entire marketing organization, the only individual who handled marketing responsibilities for raw materials as a stand-alone business unit, and that the sole area of her responsibility was raw materials. [DE 56 at 10]. Plaintiff responds that the three men who assumed her remaining responsibilities once she was terminated, Messrs. Lear, Franyutti and Ellerbe, were

---

[2]Additionally, this Court is cognizant of the following comment by the Third Circuit in *Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 511 (3d Cir. 1996), wherein the court opined that arguments as to an employee's uniqueness should be considered in conjunction with the employer's rebuttal and not at the prima facie stage:

> All employees can be characterized as unique in some ways and as sharing common ground with 'similarly situated employees' in some other ways, depending on the attributes on which one focus[]es, and the degree of specificity with which one considers that employee's qualifications, skills, tasks and level of performance.

similarly situated to her. [DE 62 at 23]. All three held E-1 positions, had skill sets similar to Plaintiff, and actually assumed Plaintiff's duties after her departure. [DE 62 at 23]. According to Defendant, Mr. Lear and Mr. Franyutti were not similarly situated to Plaintiff because Plaintiff's sole responsibility was raw materials accounts and no other manager had that same responsibility. [DE 69 at n. 3]. This Court agrees with Plaintiff that Defendant has construed the "similarly situated" requirement too narrowly. *See Monaco*, 359 F.3d at 305 (opining that "an individual does not need to be situated identically to satisfy the fourth element").

Unlike the plaintiff in *Monaco*, Plaintiff is not claiming that she was similarly situated to individuals she supervised or individuals working in entirely different management levels. Nor is she claiming that she was similarly situated to low-level or entry employees as the plaintiffs did in *Anderson*. Instead, she is pointing to employees working at the same E-1 management level in the same Elastomers business group. [DE 65 at 45]. Additionally, Jeff Lear, Business Manager Spray Elastomers/Reinforcement, and Sergio Franyutti, Business Manager Cast Elastomers, were assigned a considerable amount of Plaintiff's product responsibility in 2002 while Plaintiff was working in her Raw Materials position. [DE 65 at ¶ 53, 56]. As such, viewing the facts of record in the light most favorable to Plaintiff, this Court simply cannot say, as a matter of law, that Plaintiff is not similarly situated to retained employees Jeff Lear and Sergio Franyutti. *See Williams v. St. Joan of Arc Church*, No. 05-4953, 2007 WL 979653, * 1 (3d Cir. April 3, 2007) (reversing the district court's grant of summary judgment in an age discrimination case, brought by a plaintiff whose position was eliminated and duties were re-assigned to a younger employee, for erroneously viewing the disputed facts in the light more favorable to the movant). Plaintiff has, therefore, set forth sufficient facts to establish a prima facie case of discrimination.

### b. Pretext

Because Plaintiff has made out a prima facie case, the burden of production shifts to Defendant, which must articulate a legitimate nondiscriminatory reason for her job elimination and termination. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006), *citing Fuentes*, 32 F.3d at 763. Once Defendant articulates a nondiscriminatory reason, Plaintiff must respond by citing evidence that the rationale is pretextual. *Fuentes*, 32 F.3d at 763. In order to create a genuine issue of material fact as to whether the proffered reason is pretextual, Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve Defendant's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Plaintiff's job elimination and termination. *See Fuentes*, 32 F.3d at 764.

Defendant urges that Plaintiff's sex discrimination claim based upon the elimination of her Raw Materials position and her termination fails, even if Plaintiff can establish a prima facie case, because she cannot show that Defendant's legitimate business justification, its global reorganization, is a pretext for discrimination. [DE 56 at 10-11]. Defendant explains that in or around November of 2002, Peter Vanacker, Vice President of the Specialties Business Group, decided to eliminate "raw materials" as a stand-alone function as part of Defendant's overall plan to align Defendant's North American organization with its global organizational model. [DE at 11]. With regard to Plaintiff's termination and Defendant's failure to transfer Plaintiff to another position which survived

13

restructuring, Defendant asserts that Plaintiff was considered for at least six other positions but was not selected for any of those positions for legitimate business reasons based upon comprehensive candidate slates prepared for each position. [DE 56 at 12].

Plaintiff responds that, based upon the evidence, a jury could find that her termination was motivated by discriminatory animus and that Defendant simply used restructuring as a convenient excuse. [DE 62 at 25]. Specifically, Plaintiff points to the following facts of record: as part of the Gaetano I settlement, Plaintiff was placed in the Froth Foams position, a position which was consolidated in April 2001, just weeks after the Gaetano I settlement was finalized; when Plaintiff's Froth Foams position was consolidated, she was encouraged to take a voluntary separation package and was told by her boss and the Director of HR that there was no place for her at Bayer; five months after her Froth Foams position was consolidated, Plaintiff was assigned to the Raw Materials position, a position with no direct reports, no support staff and responsible for a function which was determined to be obsolete a year later; sixty to eighty million pounds of Plaintiff's product responsibility was assigned to two newly appointed business managers, Jeff Lear, Business Manager Spray Elastomers/Reinforcement, and Sergio Franyutti, Business Manager Cast Elastomers, both of whom had direct reports, including sales and technical staff, and survived restructuring; and during the months preceding her termination, E-1 positions were created for which Plaintiff was qualified, but Plaintiff was not awarded any of them. [DE 62 at 25]. These facts are not self-serving and conclusory allegations as Defendant contends. Rather, these are facts of record, which are not disputed by Defendant.

As stated above, to survive summary judgment, a plaintiff need only present evidence from which a reasonable factfinder could conclude *either* that the defendant's proffered justifications are

14

not worthy of credence or that the real reason for the decision was discrimination. *Fuentes*, 32 F.3d at 764. While there is ample support in the record for Defendant's explanation of Plaintiff's job elimination and termination, that is not the point. *See Torre*, 42 F.3d at 833. Looking at the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the evidence proffered by Plaintiff could persuade a reasonable jury that Defendant's real reason for terminating her employment was discrimination. *See Id.* 42 F.3d at n. 7 (holding that the plaintiff created a material issue of fact concerning whether he was transferred to a dead-end job that had effectively been eliminated before he was transferred to it.) Defendant's motion for summary judgment as to Plaintiff's claim of sex discrimination based upon her job elimination and termination is, therefore, denied. *See Iadimarco* 190 F.3d 151, 166 (3d Cir. 1999) (holding that where the plaintiff offers evidence that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail); *citing White v. Westinghouse Elec. Co.*, 862 F.2d 56, 62 (3d Cir. 1989).

### 2.    Plaintiff's Retaliation Claims

In order to state a prima facie case of retaliation, Plaintiff must establish (1) that she engaged in protected activity; (2) that Defendant took adverse employment action against her; and (3) that a causal connection exists between her participation in the protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). Evidence that can be considered probative of the causal link between protected activity and an adverse employment action "is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus," but can be "other evidence gleaned from the record as a whole from which causation can be inferred." *Id.* 206 F.3d at 281.

Plaintiff claims she was subjected to the following retaliatory actions by Defendant: (1) the consolidation of her Froth Foams position and Defendant's decision to award the newly created position of Director, Specialty Foams to James Thompson in the spring of 2001; (2) Plaintiff's transfer to the Raw Materials position in September 2001; (3) the elimination of Plaintiff's Raw Materials position and her resulting termination; and (4) Defendant's failure to hire Plaintiff for various positions which survived restructuring. Defendant contends that Plaintiff cannot maintain a retaliation claim based upon any of these alleged adverse employment actions. The Court will address each of the alleged actions in turn.

### a. Consolidation of Froth Foams position and failure to hire Plaintiff for Director, Specialty Foams position

Defendant contends that Plaintiff's retaliation claim based upon Defendant's consolidation of her Froth Foams position and failure to award Plaintiff the new, consolidated position of Director, Specialty Foams fails because Plaintiff cannot establish a prima facie case or show pretext. [DE 56 at 25, 26]. With regard to her prima facie case, Defendant argues that due to the time lapse between her protected activity and the consolidation of her position and non-selection for the new position, Plaintiff cannot establish the necessary causal link. [DE 56 at 25]. Even if Plaintiff can set forth a prima facie case, Defendant maintains that Plaintiff's claim still fails because she cannot demonstrate that Defendant's reasons for hiring James Thompson for the Director, Specialty Foams position was "so plainly wrong that it could not have been the employer's real reason" or that invidious discrimination was the more likely cause. [DE 56 at 26], citing *Keller* 130 F.3d 1101, 1109-110 (3d Cir. 1997).

### I. Causal connection

According to Defendant, Plaintiff cannot show a causal connection between her original lawsuit, filed May 22, 1998, and Defendant's failure to hire her for the Director, Specialty Foams position in April of 2001 due to the three year time lapse. [DE 56 at 25]. Defendant further points out that approximately ten years had elapsed since Plaintiff first began complaining of discrimination. *Id*. In support of this argument, Plaintiff cites *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751 (3d Cir. 2004), wherein the court held that a two month time lapse between protected activity and the alleged retaliation did not create an inference of retaliatory intent. In *Williams*, however, the plaintiff *relied* on timing to establish a causal link because he had no other evidence suggesting that he was terminated due to his request for an accommodation. *Williams*, 380 F.3d at 760. Here, Plaintiff need not depend upon temporal proximity to establish a causal connection between her protected activities and the elimination of her job. "When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

Plaintiff directs the Court to the following evidence of retaliatory animus: the January 23, 2001 email from Robert Daniele to Ann Hoover regarding the job description for the Director, Specialty Foams position which establishes that Defendant intended to eliminate Plaintiff's Froth Foams position before the parties finalized the Gaetano I settlement agreement in March of 2001; the consolidation of her Froth Foams position just weeks after the parties finalized the Gaetano I settlement agreement; Plaintiff's conversation with Robert Daniel and Ann Hoover regarding the consolidation of her position wherein Plaintiff was told she had no place at Bayer and was encouraged to accept a voluntary severance package; and Defendant's decision not to award the

Director, Specialty Foams position to Plaintiff. [62 at 13; 65 at ¶¶ 23, 24]. This Court agrees that, taken as a whole and viewed in the light most favorable to Plaintiff, these facts are sufficient to create the inference of a causal connection. *See Farrell*, 206 F.3d at 286 (holding that the evidence, taken as a whole and in the light most favorable to the plaintiff, sufficiently created the required inference of causation).

### ii.    Pretext

Defendant contends that Plaintiff cannot demonstrate that Defendant's reason for hiring James Thompson for the Director, Specialty Foams position was "so plainly wrong that it could not have been the employer's real reason" or that invidious discrimination was the more likely cause. [DE 56 at 26], citing *Keller* 130 F.3d 1101, 1109-110 (3d Cir. 1997). To the contrary, the same evidence creating an inference of causation, discussed above, sufficiently demonstrates retaliatory animus such that a factfinder could reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Plaintiff's job consolidation and non-selection for the Director, Specialty Foams position. *See Fuentes*, 32 F.3d at 764; *see also Farrell*, 206 F.3d at 286 (the same evidence supporting the plaintiff's prima facie case may also be used to show pretext) (citations omitted). While Defendant has proffered evidence regarding its downsizing efforts in 2001 and reasons for preferring James Thompson for the Director, Froth Foams position, the evidence at this stage must be viewed in the light most favorable to Plaintiff and all inferences must be drawn in her favor. *See Marino,* 358 F.3d at 247, *citing Anderson,* 477 U.S. at 255; *see also County of Centre, Pa.*, 242 F.3d at 446. Defendant's motion for summary judgment as to Plaintiff's retaliation claim based upon the consolidation of her Froth Foams position and subsequent denial of the Director, Specialty Foams job is, therefore, denied.

### b.    Transfer to Raw Materials Position

According to Defendant, Plaintiff cannot base any retaliation claim upon her transfer to the Raw Materials position because the transfer does not constitute an adverse employment action.[3] [DE 56 at 20-21 n. 15].  As enunciated by the United States Supreme Court in *Burlington Northern*, a materially adverse action, for purposes of establishing a prima facie retaliation claim, is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S. Ct. at 2415 (internal quotation omitted).  Accordingly, the issue here is whether Plaintiff's job reassignment to Raw Materials would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Defendant argues that because Plaintiff maintained her E-1 management status and the same pay scale as her previous position, her transfer to the Raw Materials position did not result in an action that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  [DE 56 at 21 n. 15], citing *Storey v. Burns Int'l Sec. Srvs.*, 290 F.3d 760, 764 (3d Cir. 2004).  *Burlington Northern*, however, specifically holds that employer actions prohibited by the anti-retaliation provision are not limited to conduct that "affects the employee's compensation, terms, conditions, or privileges of employment" and that reassignment of job duties

---

[3]In addition to its contention that Plaintiff cannot maintain a retaliation claim based upon her transfer to the Raw Materials position, Defendant argues that Plaintiff cannot base any separate retaliation claim on certain aspects of the position, i.e. the reassignment of Plaintiff's products to Jeff Lear and Sergio Franyutti and the lack of administrative support.  Based upon her opposition briefs, however, Plaintiff is not claiming that she is bringing separate retaliation claims based upon these actions. [DE 62; 75].  Instead, Plaintiff raises the reassignment of her products and her lack of administrative support not as separate claims but in support of her claim that the transfer to Raw Materials and position elimination were retaliatory. [DE 62 at 10, 14, 15 n. 6, 21].  As such, this Court finds that the reassignment of Plaintiff's products and her lack of administrative support are subsumed by Plaintiff's retaliation claim based upon the transfer to the Raw Materials position and the elimination of that position.

can constitute a materially adverse action.[4]   *Burlington Northern*, 126 S. Ct. at 2405, 2417.

Plaintiff, in support of her argument that the transfer to the Raw Materials position does constitute a materially adverse action under *Burlington Northern*, points to the following facts of record: (1) her direct reports were removed from her, leaving her with no supervisory responsibility; (2) she no longer reported directly to VP Peter Vanacker and was removed from the VP's leadership team, a career-building opportunity; and (3) she was no longer eligible to receive a bonus.  [DE 66 at 6, 22; 71 at 1].   While this evidence is not terribly strong in light of the fact that Defendant continued to employ Plaintiff while laying off 37 other employees due to its 2001 downsizing efforts [DE 56 at 21 n. 15], at this stage the Court must view the evidence in the light most favorable to Plaintiff.  With this in mind, Plaintiff has presented sufficient evidence that her transfer to the Raw Materials position would have been "materially adverse to a reasonable employee."  *See Burlington Northern*, 126 S. Ct. at 2417.

### c.     Raw Materials Position Eliminated

Defendant contends that Plaintiff's retaliation claim based upon the elimination of her Raw Materials position fails because Plaintiff cannot establish a causal link between her protected activity and the elimination of her job. [DE 56 at 12].  Defendant bases this argument on the following facts: (1) Peter Vanacker, the decision maker, was unaware that Plaintiff had filed any charges of discrimination or complained of discrimination before terminating her employment; and (2) there is a lack of temporal proximity between Plaintiff's protected activity and the elimination of her job.

---

[4]While Defendant recognizes the standard set by *Burlington Northern* in its Supplemental Memorandum, it does not argue why Plaintiff's transfer to Raw Materials would not have been "materially adverse to a reasonable employee." [DE 78 at 1-2]; *Burlington Northern*, 126 S. Ct. at 2417 (holding that a jury could reasonably conclude that the reassignment of the plaintiff from forklift operator to the less prestigious and more arduous job of track laborer would have been materially adverse to a reasonable employee.

[DE 56 at 13]. Defendant further argues that even if Plaintiff could establish a prima facie case of retaliation, she cannot establish that Defendant's stated justifications (the RIF and decision to eliminate raw materials as a stand-alone function) are a pretext for discrimination. [DE 56 at 14].

### i.    Causal connection

Defendant first argues that Plaintiff cannot establish a causal connection between her position elimination and termination and her protected activity because Peter Vanacker, who made the decision to eliminate the Raw Materials position, was not aware of Plaintiff's previous complaints and charges of discrimination. Indeed, "if the individual who takes an adverse employment action against the plaintiff had no knowledge that she engaged in protected activity, there can be no causal connection between the two." *Mihalik v. Eckerd Corp.*, 2005 WL 35918, *8 (E.D. Pa. Jan. 7, 2005), *citing Bedford v. Southeastern Pennsylvania Transp. Auth.,* 867 F. Supp. 288, 293 (E.D. Pa. 1994), *Jones v. School Dist. Of Philadelphia,* 198 F.3d 403, 415 (1999).

Plaintiff responds that there is evidence sufficient to raise an issue of material fact as to whether Mr. Vanacker knew of Plaintiff's complaints of discrimination. Specifically, Plaintiff points to the following facts of record: (1) on one occasion when speaking with Plaintiff, Mr. Vanacker referred to Plaintiff's protected activities as the "little problem you're causing us;" (2) Defendant's HR Director, Ann Hoover, testified that managers are routinely notified of the filing of a charge by the in-house legal staff for purposes of gathering information to prepare the Position Statement and Mr. Vanacker was VP of the Specialties Group at the time Plaintiff filed her February 2002 charge and Defendant filed its April 2002 Position Statement; (3) during his deposition, Mr. Vanacker first testified that he could not recall exactly when he learned of Plaintiff's February 2002 charge, then later testified that he learned of it after she was terminated; and (4) Mr. Vanacker participated in the

"Leadership Teams" with Plaintiff's previous supervisors about whom she complained in Gaetano I and who had extensive knowledge of Plaintiff's history of protected activity. [DE 62 at 16-17].

This circumstantial evidence raises an issue of material fact as to whether Mr. Vanacker knew of Plaintiff's protected activity before eliminating her Raw Materials position. *See Ridley v. Costco Wholesale Corp.*, 2007 WL 328852, *3 (3d Cir. Feb. 5, 2007) (holding that circumstantial evidence from which a jury could find that the plaintiff's supervisor knew of the plaintiff's complaints of discrimination was sufficient to support the jury's finding in favor of the plaintiff on his retaliatory discharge claim despite the fact that the supervisor denied having such knowledge); *citing Hill v. City of Scranton*, 411 F.3d 118, 131 n.22 (3d Cir. 2005) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) and noting that on a motion for summary judgment, the court "should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant").

Defendant next argues that Plaintiff cannot establish a causal connection between her February 2002 protected activities and the elimination of her job, approximately 11 months later, due to a lack of temporal proximity. [DE 56 at 13]. Consequently, Defendant argues, Plaintiff cannot establish an inference of retaliatory animus based "solely" on the timing of the protected activity *vis a vis* the adverse action. *Id.* As with Plaintiff's retaliation claim based upon the consolidation of her Froth Foams position, Plaintiff need not depend upon temporal proximity to establish a causal connection. *See Krouse*, 126 F.3d at 503. Taken as a whole and viewed in the light most favorable to Plaintiff, the facts relating to the consolidation of her Froth Foams position, her delayed transfer to the Raw Materials position, a position with no direct reports or support staff, and the eventual elimination of her Raw Materials position are sufficient to create the inference of a causal connection

between her protected activities and the elimination of her job. *See Farrell*, 206 F.3d at 286.

### ii.    Pretext

Once again, Defendant contends that even if Plaintiff can set forth a prima facie case, her claim ultimately fails because she cannot show that its reasons for the elimination of her Raw Materials position, the RIF and decision to eliminate raw materials as a stand alone function, was a pretext for retaliation. [DE 56 at 14]. To the contrary, the facts relating to the pre-Gaetano I settlement plan to consolidate Plaintiff's Froth Foams position, Defendant's actual consolidation of Plaintiff's Froth Foams position just weeks after finalizing the Gaetano I settlement agreement, placement of Plaintiff, months later, in the Raw Materials position with no direct reports or support staff, and the distribution of some of Plaintiff's responsibilities to men in newly created E-1 positions which survived restructuring, support an inference of retaliatory animus. *See Farrell*, 206 F.3d at 286 (holding that the plaintiff faced no separate burden to substantiate the inference drawn from her boss's abrupt departure from a work trip together after she shunned his advances; "rather, the district court is to draw inferences in her favor at this procedural stage"); *citing* Iadimarco v. Runyon, 190 F.3d 151, 164 (3d Cir. 1999). Defendant's motion for summary judgment as to Plaintiff's retaliation claim based upon her job elimination is, therefore, denied. *See Farrell*, 206 F.3d at 286 (the same evidence supporting the plaintiff's prima facie case may also be used to show pretext) (citations omitted).

### d.    Failure To Hire Plaintiff For Various Positions In Early 2002

Plaintiff was passed over for several positions in the first half of 2002 including: Business Manager Spray Elastomers/Reinforcement, awarded to Jeff Lear in April 2002; Business Manager

Cast Elastomers, awarded to Sergio Franyutti in April 2002; Division Marketing Specialist, Special Products, awarded to Sean Gaus in May 2002; and Industry Manager Canal Liners, awarded to Rolland Bradley in May 2002. [DE 62 at 7-8]. Defendant posits that Plaintiff's claims based upon Defendant's failure to hire her for these positions are untimely. [56 at 14-16]. This Court agrees.[5]

Under Title VII, a plaintiff must file a complaint with the Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice. 42 U.S.C. § 2000e-5(e)(1); *see also Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The PHRA requires that a complaint of discrimination be filed with the Pennsylvania Human Relations Commission within 180 days after the unlawful employment practice. 43 P.S. § 959.

Plaintiff's first charge of discrimination and retaliation, filed February 26, 2002, concerned only the elimination of her Froth Foams position and Defendant's failure to award her the new, consolidated position of Director, Specialty Foams. [DE 63-3, Ex. 20]. Plaintiff's second charge was not filed until May 22, 2003. As such, any Title VII claims based upon acts, other than those listed in her initial charge, had to occur on or after July 25, 2002 (the 301st day before her charge was filed) to be timely and any PHRA claims had to occur on or after November 23, 2002 (the 181st day before her charge was filed) to be timely. There is no dispute that Plaintiff was passed over for all of the aforementioned positions before July 25, 2002. Plaintiff's retaliation claims based upon her non-

[5]The court notes that Plaintiff does not respond to Defendant's timeliness argument except to point out that "evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.'" [DE 62 at 7-8, 15, n. 6], citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2nd Cir. 2005) (citing *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002)).

selection for these various positions are, therefore, untimely. Defendant's motion for summary judgment as to Plaintiff's retaliation claims based upon Defendant's failure to hire her for the Business Manager Spray Elastomers/Reinforcement, Business Manager Cast Elastomers, Division Marketing Specialist - Special Products, and Industry Manager Canal Liners positions is, therefore, granted.[6]

### B. Breach Of Contract Claim

Plaintiff claims Defendant breached the Gaetano I settlement agreement by retaliating against her in violation of the terms of the agreement and failing to remove the disparaging materials from her personnel file. Defendant succinctly argues that because Plaintiff cannot survive summary judgment with respect to her Title VII or PHRA retaliation claims, her claim based upon Defendant's breach of the no-retaliation provisions of the Gaetano I settlement agreement also fails. [DE 56 at 31]. This Court, however, has determined that Plaintiff's retaliation claims, except for those based upon Defendant's failure to hire Plaintiff for certain positions in early 2002, survive summary judgment. *See* Section V(A)(2)(a)-(d) *supra*. Accordingly, Plaintiff's breach of contract claim based upon Defendant's alleged retaliation also survives.

Defendant next asserts that Plaintiff's breach of contract claim based upon its failure to remove certain documents from her personnel file fails because she can point to no evidence to suggest that she was harmed in any way by this activity. [DE 56 at 31-32]. Plaintiff counters that

---

[6]Additionally, Defendant contends that Plaintiff cannot base any retaliation claim upon allegedly discriminatory parking warnings. [DE 56 at 29]. Plaintiff, however, does not address these allegedly discriminatory parking warnings in her summary judgment filings. As the warnings to Plaintiff regarding her parking in an undesignated area, an infraction which Plaintiff does not challenge, did not result in any fine or discipline, this Court finds that the alleged parking warning does not constitute a "materially adverse action" as necessary to state a retaliation claim. *See Burlington Northern*, 126 S. Ct. at 2417.

the "potential harm" to her "if" a hiring manager reviewed these documents was that the hiring manager could have chosen not to place her in a new position or promote her. [DE 62 at 26-27]. As such, the parties impliedly agree that Defendant breached the settlement agreement and that Plaintiff's damages are speculative.

Defendant posits that Plaintiff's speculative damages are fatal to her claim. Defendant cites *Schwarzwaelder v. Fox*, 895 A.2d 614 (Pa. Super. 2006) (holding that without some plausible allegation of damages, the plaintiff's breach of contract claim could not be sustained), in support of this argument. In *Schwarzwaelder*, however, the court agreed with the trial court that the plaintiffs suffered no cognizable harm. *Schwarzwaelder*, 895 A.2d at 614. Whereas, here, the evidence of record creates an issue of fact as to whether Plaintiff sustained damages as a result of Defendant's breach. The facts relating to the nature of the documents in question (the settlement agreement recognizes that the documents contained "unfavorable remarks about Gaetano" [DE 63-19 at ¶5]), that the documents remained in Plaintiff's personnel file while hiring decisions were made, that the decision makers of those hiring decisions had access to Plaintiff's personnel file, and that Plaintiff was considered for but denied several positions which survived restructuring create a question of fact as to whether Plaintiff sustained any damages as a result of Defendant's breach. That said, the Court agrees with Defendant that Plaintiff's damages are speculative as there is no evidence that any hiring manager actually reviewed the offending documents.

Plaintiff responds that under Pennsylvania law, a plaintiff who can establish a breach but can show no damages flowing from the breach is entitled to recover nominal damages. In support of this argument, Plaintiff cites *Thorsen v. Iron and Glass Bank*, 328 Pa. Super. 135, 141, 476 A.2d 928, 931 (1984). In *Thorsen*, the court opined, "[a] grant of summary judgment on the sole basis of

26

absence of provable damages, therefore, is generally improper." *Thorsen*, 476 A.2d at 931, *citing*

*Nemitz v. Reuben H. Donnelley Corp.*, 225 Pa. Super. 202, 207, 310 A.2d 376, 379 (1973) (holding

that judgment in favor of the defendant in a breach of contract case is improper where the breach is

admitted as the plaintiff would at least be entitled to nominal damages). This comment is consistent

with the Pennsylvania Supreme Court's holding in *Elia v. Olszewski*, 368 Pa. 578, 582, 84 A.2d 188,

191 (1951), wherein the court held that "in no event could a verdict for the defendant be justified in

a case where the breach of contract is admitted."[7]  Indeed, this Court is bound by the Pennsylvania

Supreme Court's decision in *Elia. See Pahle v. Colebrookdale Twp.,* 227 F. Supp. 2d 361, 367 (E.D.

Pa. 2002) (noting that federal district courts applying state law must defer to the state's highest

court).

Accordingly, given the lack of dispute over whether Defendant failed to remove the

disparaging documents from Plaintiff's personnel file, summary judgment in favor of Defendant

would be improper. *See Elia; see also See Coca-Cola Bottling Co. of Elizabethtown, Inc. v.*

*Coca-Cola Co.,* 988 F.2d 386, 409 (3d Cir. 1993) (holding that since the plaintiffs suffered no loss

of expectancy or bargained for economic benefit, only nominal damages could be awarded on the

contract), *citing* Restatement (Second) of Contracts § 346(2) (1981) ("If the breach caused no loss

... a small sum fixed without regard to the amount of loss will be awarded as nominal damages.")

Accordingly, Defendant's motion for summary judgment as to Plaintiff's breach of contract claim

is denied.

---

[7]Furthermore, relying on *Elia, Thorsen* and *Nemitz*, the court in *Rolland, S.A. v. Smithkline Beckman Corp.*, No. 85-3217, 1990 WL 90492, *1 (E.D. Pa. 1980), held "**[t]he case law is clear** that where a plaintiff can prove a breach of contract but can show no damages flowing from the breach, the plaintiff is entitled to recover nominal damages" (emphasis added).

### C.    Plaintiff's Fraudulent Concealment Claim

Defendant raises multiple arguments in support of the dismissal of Plaintiff's fraudulent concealment claim including, *inter alia*, that the claim is barred by the statute of limitations. [DE 56 at 32, 37, 39, 41, 43 44]. This Court agrees that Plaintiff's fraudulent concealment claim is time barred.

As clearly set forth in her Amended Complaint, the basis of this claim is Defendant's alleged concealment of its plan to eliminate Plaintiff's Froth Foams position during Gaetano I settlement negotiations: "As a result of Bayer's concealment of the fact that Gaetano's E-1 position was going to be eliminated in the <u>Gaetano v. Bayer</u>, Civil Action No. 98-917, Gaetano suffered and continues to suffer injuries including monetary damages by settling <u>Gaetano v. Bayer</u>, Civil Action No. 98-917 for less monetary damages than she would have had she known her E-1 position was soon to be eliminated, lost wages, and emotional distress, embarrassment and damage to professional reputation, and has incurred consequential damages." [DE 39 at ¶ 57]. As such, the fraud occurred in March of 2001 when the parties negotiated and finalized the Gaetano I settlement agreement. The statute of limitations for a claim of fraud in Pennsylvania is two years. 42 Pa.C.S. 5524. Plaintiff, however, did not institute this lawsuit until November 24, 2004, and the fraud claim was not pled until June 6, 2006, well beyond the two year statute of limitations. According to Plaintiff, her claim is not time barred because the statute of limitations was tolled by the discovery rule. [DE 62 at 32].

The discovery rule is an exception to the requirement that a complaining party must file suit within the statutory period. *Cochran v. GAF Corp.*, 542 Pa. 210, 216, 666 A.2d 245, 248-49 (1995). The discovery rule provides that where the existence of the injury is not known to the complaining

party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible. *Baselice v. Franciscan Friars Assumption BVM Province, Inc.,* 879 A.2d 270, 276 (Pa. Super. 2005) (citations and quotations omitted). The statute begins to run in such instances when the injured party possesses sufficient critical facts to put her on notice that a wrong has been committed and that she needs to investigate to determine whether she is entitled to redress. *Id., citing Haggart v. Cho*, 703 A.2d 522, 526 (Pa. Super. 1997). "[O]ne claiming the benefit of the exception bears the burden of establishing that she falls within it." *Cochran,* at 216, 666 A.2d at 249; *see also Toy v. Metropolitan Life Ins. Co.*, 863 A.2d 1, 7 (Pa. Super. 2004) ("[w]hen a plaintiff seeks to benefit from the discovery rule, he/she has the burden of establishing his/her inability to know of the injury despite the exercise of due diligence") *citing Dalrymple v. Brown*, 549 Pa. 217, 224, 701 A.2d 164, 167 (1997).

"As the discovery rule has been developed, the salient point giving rise to its application is the inability of the injured, *despite the exercise of reasonable diligence*, to know that he is injured and by what cause." *Fine v. Checcio*, 582 Pa. 253, 267, 870 A.2d 850, 858 (2005) (emphasis added), *citing Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983). "Therefore, when a court is presented with the assertion of the discovery rules application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause." *Fine,* at 268, 870 A.2d at 858, *citing Crouse v. Cyclops Industries*, 560 Pa. 394, 404, 745 A.2d 606, 611 (2000). "Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it." *Id.* (Citations omitted). "Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise

of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law." *Fine,* at 268, 870 A.2d at 858-59, *citing Pocono,* 668 A.2d at 471.

Accordingly, the specific issue here is what the record reveals as to Plaintiff's ability, *exercising reasonable diligence*, to know of Defendant's alleged concealment of its plan to consolidate Plaintiff's job during the parties' March 2001 settlement negotiations. *See Fine,* at 272, 870 A.2d 861. On this issue, Plaintiff posits that despite her exercise of reasonable diligence, "[i]t was only during discovery in this case, after Gaetano's attorneys obtained and then analyzed thousands of documents, and after taking the depositions of Bayer managers in late 2005 and early 2006 did Gaetano learn the facts that gave rise to her claim of fraudulent concealment." [DE 62 at 33]. In support of her assertion that she exercised reasonable diligence, Plaintiff states, Gaetano filed an EEOC charge after her position was eliminated and participated in the administrative process. The administrative proceedings failed to unearth the date on which Bayer knew that it was going to eliminate the E-1 position." [DE 62 at 33].

This Court finds that Plaintiff has failed to proffer sufficient facts to establish that she exercised reasonable diligence to ascertain her injury as required to benefit from the discovery rule. Reasonable diligence is "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Crouse,* 560 Pa. at 404, 745 A.2d at 611. "A plaintiff's actions must be evaluated, therefore, to determine whether he exhibited 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.'" *Id., citing Burnside v. Abbott Laboratories,* 351 Pa. Super. 264, 292, 505 A.2d 973, 988 (1985), *appeal denied* (Dec. 18, 1986). As colorfully stated by the Pennsylvania Supreme Court in *Cochran,* "[o]ur cases firmly establish that the 'reasonable

diligence' standard has some teeth." *Cochran,* at 220, 666 A.2d at 250. "Thus, we have not hesitated to find as a matter of law that a party has not used reasonable diligence in ascertaining the cause of an injury thus barring the party from asserting their claim under the discovery rule." *Id.* at 216, 666 A.2d at 248.

Plaintiff's only evidence of "reasonable diligence" is her EEOC charge and participation in those administrative proceedings. Plaintiff, however, does not allege or even imply that the timing of the decision to consolidate her Froth Foams position was an issue in those proceedings. Moreover, the fact that the EEOC proceedings did not "unearth" the date on which Defendant decided to consolidate Plaintiff's position evidences Plaintiff's failure to inquire into this issue while pursuing her EEOC charge.[8]

Based upon Plaintiff's own allegations and the evidence of record, she made no effort to investigate this particular claim. Despite the remarkably short time frame between the completion of Gaetano I settlement negotiations on March 9, 2001 and the consolidation of Plaintiff's Froth Foams position the following month, Plaintiff offers no evidence of any inquiries made to Defendant, of any conversations or discussions with Defendant, or of any comments by Defendant as to the timing of Defendant's decision to eliminate her Froth Foams position. *See Toy*, 863 A.2d at 7 (determining that the plaintiff, who never contacted defendants or made any inquiries about her retirement plan, failed to exercise reasonable diligence in connection with her fraudulent misrepresentation claim regarding a retirement plan). As such, this is not a situation where Plaintiff

---

[8]The Court notes that Plaintiff is an educated, intelligent individual who has been represented by capable counsel, the *same* capable counsel, since the filing of Gaetano I on May 22, 1998. [DE 63-3 at 27 fo 45]. It was incumbent upon Plaintiff and/or her counsel to probe into these issues during Plaintiff's EEOC proceedings, if not before.

inquired or even attempted to inquire of Defendant about the timing of its decision to consolidate her job. *Compare Fine,* at 261-63, 870 A.2d 854-56 (plaintiffs repeatedly and specifically discussed sensations of numbness with the defendant-dentists who advised the plaintiffs that the numbness would eventually subside). Nor is this a situation where Defendant, through comments or assurances or any other actions, led Plaintiff to believe that it did not decide to consolidate her job until after it settled Gaetano I. *Compare Crouse*, at 404, 745 A.2d at 611 (plaintiff presented evidence of his ongoing interactions with defendant and defendant's reassurances which led plaintiff to believe that defendant had not breached its promises to the plaintiff).

Plaintiff impliedly and unconvincingly argues that she had no way of knowing of Defendant's actionable conduct until the discovery phase of this case in 2005 and 2006 produced information that Defendant planned to consolidate Plaintiff's Froth Foams position before the parties finalized the settlement agreement in March of 2001. [DE 62 at 33]. This argument is not persuasive because the discovery rule does not require a plaintiff to know the exact nature of her injury, as long as it objectively appears that the plaintiff is reasonably charged with the knowledge that she has an injury caused by another. *See Ackler v. Raymark Industries, Inc.*, 380 Pa. Super. 183, 188, 551 A.2d 291, 293 (1988). Plaintiff was well aware of the short time frame between the completion of the Gaetano I settlement agreement and the consolidation of her Froth Foams position.[9] This timing, a critical fact supporting Plaintiff's claim that retaliatory animus motivated Defendant's decision to consolidate her position, combined with the language of the settlement agreement regarding

---

[9]Notably, Plaintiff sets forth no explanation for why she did not investigate the timing of Defendant's decision. She does not proffer any facts as to why she did not find the one month time period between the completion of the settlement agreement and the consolidation of her job to be indicative of the fact that Defendant had been planning to consolidate her job prior to finalizing the agreement. In the event the timing did concern Plaintiff, she offers no evidence as to why she did not act on these concerns.

"anticipated reductions in force in Plaintiff's business unit" was sufficient to put Plaintiff on notice that Defendant planned to consolidate her Froth Foams position during the parties' settlement negotiations.[10] Furthermore, Plaintiff's reliance on *Wawrzynek v. Statprobe, Inc.*, 422 F. Supp. 2d 474, 481 (E.D. Pa. 2005) on this point is misplaced.

In *Wawrzynek,* the plaintiff, after suffering a post-surgical complication in 1999 allegedly caused by the drug ADCON-L, filed suit against her surgeons (in 2000) and the manufacturer of ADCON-L, Gliatech, Inc., (in 2000). *Wawrzynek*, 422 F. Supp. 2d at 478. On March 1, 2005, the plaintiff also sued Statprobe, Inc., a bioanalysis company, for its alleged participation in Gliatech's fraudulent submission of ADCON-L studies to the FDA. Statprobe moved to dismiss the plaintiff's claims as time-barred. *Id.* at 477. The plaintiff responded that it did not discover Statprobe's identity or participation in the fraudulent FDA studies until Gliatech produced documents in October and November of 2003. *Id.* at 480. Statprobe argued that the discovery rule did not apply to plaintiff's claims because the plaintiff did not exercise reasonable diligence to ascertain the cause of the plaintiff's injury, pointing out that the plaintiff's injury was detected in February of 2000 and that the plaintiff was aware of Gliatech's involvement in 2002. *Id.* According to Statprobe, had the plaintiff exercised reasonable diligence, she would have known of Statprobe's relationship with Gliatech and involvement in the ADCON-L studies. *Id.* The plaintiff responded that, even exercising reasonable diligence, it was impossible for them to discover Statprobe's involvement until the documents provided in the Gliatech discovery were produced. *Id.* The Court denied Statprobe's motion, holding that the complaint averred facts that could lead a reasonable juror to conclude that

---

[10]The portion of the Gaetano I settlement agreement referencing the "anticipated reductions in force" is paragraph number 4 , the anti-retaliation paragraph.

the plaintiff had no way of knowing of Statprobe's alleged actionable conduct until her receipt of discovery. *Id.* The court further suggested that the undeveloped record created a question of fact as to whether Statprobe's name was publicly connected with the ADCON-L studies, and thus whether reasonable diligence could have revealed Statprobe's involvement. *Id.*

Just recently, Statprobe raised this defense again in a motion for summary judgment. *Wawrzynek v. Statprobe, Inc.*, No. 05-1342, slip op. at 1 (E.D. Pa. Oct. 25, 2007). Statprobe contended that the factually developed record established that the plaintiff did not exercise reasonable diligence. *Wawrzynek*, slip op. at 6. In support of the argument, Statprobe proffered numerous public documents which would have informed the plaintiff of Statprobe's role in the events underlying the suit, including Gliatech's Form 8-K filing with the Securities and Exchange Commission on October 16, 2000, an article published in *The Cleveland Plain Dealer* on August 31, 2000, and the transcript of the December 1997 FDA Advisory Panel meeting minutes. *Id.* at 6, 7. In response, the plaintiff pointed to the following facts indicating that she exercised reasonable diligence: in December 2000, she timely and actively pursued the medical professionals whom she believed to have caused her injuries; after learning in July 2002 that Gliatech pled to guilty submitting false information relating to the ADCON-L study, she instituted suit against Gliatech; when she finally received Gliatech's discovery in October and November of 2003, she uncovered facts relating to Statprobe's involvement in the ADCON-L studies; and she filed suit against Statprobe within two years after receiving the discovery from Gliatech. *Id.* at 7-8. Ultimately, the court denied Statprobe's motion, holding that Statprobe's arguments placed a "weighty responsibility" on the plaintiff to "scour the nation's newspapers" and local media "for possible defendants with potential responsibility for her injuries." *Id.* at 8. The court further noted that the

documents referenced by Statprobe failed to identify Statprobe by name. *Id.* With regard to the FDA Advisory Panel meeting minutes, the only statement about Statprobe was a single sentence noting Statprobe's responsibility for statistics in a *European* study concerning ADCON-L. *Id.* The court, therefore, held that the facts did not lead to the single conclusion that reasonable diligence would have implicated Statprobe sooner. *Id.* at 9. Due to the stark contrast between the facts of *Wawrzynek* and the facts here, that case does more to undermine Plaintiff's case than to bolster it.

In this case, Plaintiff is not charged with scouring newspapers, local media or any other information source for information relating to Defendant's allegedly fraudulent conduct. Plaintiff remained an employee after she was informed that her job was being consolidated and, consequently, could have inquired into Defendant's decision to consolidate her position at any time. She, apparently, failed to do so. There is no evidence indicating that information regarding the timing of Defendant's decision was inaccessible to Plaintiff or not within her reach on any given day. As such, unlike the facts in *Wawrzynek*, here, there are no facts from which a reasonable juror could conclude that Plaintiff had *no way* of knowing of Defendant's alleged concealment prior to her receipt of the discovery material in 2005 and 2006.

Although the Court reads the facts in the light most favorable to Plaintiff, there are simply no facts from which a fact finder could reasonably infer that Plaintiff exercised the diligence required for the application of the discovery rule. Defendant's motion for summary judgment as to Plaintiff's claim of fraudulent concealment is, therefore, granted.

## VI.    CONCLUSION

AND NOW, this 8th day of November, 2007, after consideration of the Defendant's Motion

35

for Summary Judgment [DE 54], in accordance with the foregoing Memorandum Opinion, it is hereby ordered that Defendant's Motion is **GRANTED** in part and **DENIED** in part as follows:

1.) Defendants' Motion is **GRANTED** with respect to Plaintiff's Title VII retaliation claim based upon Defendant's failure to hire her for various positions prior to July 25, 2002 and Plaintiff's PHRA retaliation claim based upon Defendant's failure to hire her for various positions prior to November 23, 2002;

2.) Defendants' Motion is **GRANTED** with respect to Plaintiff's retaliation claim based upon allegedly discriminatory parking warnings; and

3.) Defendant's Motion is **GRANTED** with respect to Plaintiff's claim of fraudulent concealment.

Defendant's Motion is **DENIED** in all other respects. An appropriate Order follows.

s/Nora Barry Fischer
Nora Barry Fischer
United States District Judge

cc/ecf: All ECF registered counsel